IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


VALDIVIA-DE LOS RIOS V. VALDIVIA


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


JUAN VALDIVIA-DE LOS RIOS, APPELLANT,

V.

CRYSTAL VALDIVIA, APPELLEE.


Filed May 9, 2023.    No. A-22-400.


Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Ryan D. Caldwell, of Caldwell Law, L.L.C., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.


PIRTLE, Chief Judge, and MOORE and WELCH, Judges.

PIRTLE, Chief Judge.

### INTRODUCTION

Juan Valdivia-De Los Rios appeals from the district court for Douglas County, which dissolved the marriage between Juan and Crystal Valdivia and adopted a stipulated parenting plan as to the parties' four children. The court further resolved matters of child support, alimony, and an equitable division of the marital estate. On appeal, Juan raises challenges to the district court's handling of child support, alimony, and division of the marital estate. For the reasons that follow, we affirm.

- 1 -

BACKGROUND

*General Background.*

Juan and Crystal married in September 2007, and four children were born to the marriage. The parties separated sometime between February and May 2018, at which time Juan moved to Lima, Peru, where he continued to live and work throughout this case. Juan filed a complaint for dissolution of marriage on October 16, 2018. Crystal filed an answer and counterclaim on December 5, 2018. On October 25, 2019, the district court entered an order awarding temporary care, custody, and control of the children to Crystal and ordering Juan to pay $10,000 per month in temporary spousal support. A bench trial on the complaint and counterclaim was held over the course of two days on September 28, 2021, and February 11, 2022. Juan and Crystal were the only witnesses to testify at trial.

There was no dispute regarding custody and parenting time matters, as both parties agreed that Crystal be awarded sole physical and legal custody of the children, subject to Juan's reasonable rights of parenting time. The central disputes at trial were financial matters, such as a proper accounting of Juan's income for purposes of child support and alimony, and a proper division of the marital estate. The district court entered a decree of dissolution resolving these matters on March 21, 2022.

*Alimony and Child Support.*

Crystal testified that she was trained as a cosmetologist and engaged in that line of work prior to the parties' marriage. Just prior to the birth of the parties' first child in 2009, they agreed that Crystal would remain home with the child, and Crystal continued to stay at home with the children until after the parties' separation. There was no dispute that Crystal provided 100 percent of the children's care, and Juan admitted he had not had "an overnight visit" with the children since 2018 and had "never had the children overnight by [himself]."

Crystal testified that Juan "abandoned" her and the children when he left the country in the spring of 2018. Crystal recalled that Juan initially continued to pay for some expenses, but that such payments ceased in August 2018. This left Crystal and the children "stranded without a penny" as the parties' home was nearing foreclosure. Crystal testified that she was forced to "sell as much stuff as [she] could," including the parties' wedding rings, and she was ultimately forced to sell the parties' home and relocate the children. Crystal described how these events "traumatized" her children, adding that each of the children had started seeing a counselor for various mental health concerns.

After over 10 years out of the workforce, Crystal renewed her cosmetology license in October 2020, and she started working in the evenings and on weekends when she could arrange child care. However, Crystal testified that she had not started to turn a profit in light of the associated costs and her limited availability to work. Crystal testified to $14,511 in total monthly expenses for her and the children.

Despite being ordered to pay $10,000 per month in temporary spousal support in October 2019, Juan failed to make any temporary spousal support payments until April 2020. Thereafter, Juan made a number of partial monthly payments ranging from $349 to $7,250. Juan owed over $150,000 in temporary support arrears as of September 2021. Both parties testified that Juan

consistently paid around $7,000 in the months after September 2021, and Juan represented that his arrears had increased to $167,984 as of the second day of trial in February 2022. Juan's position was that he simply could not afford the full temporary spousal support in light of his expenses and income at the time. In support of this assertion, Juan provided a list of purported monthly expenses which totaled $5,925, and he suggested that his net monthly income was $8,050.

Included in Juan's listed expenses was $2,500 for "Mortgage/Rent Payment," however, he testified that he was not paying for his residence at the time. Rather, Juan explained that his current residence "is owned by a friend of mine . . . he is letting me stay there." Juan added that he is "supposed to pay $2,000, but . . . I told him that I cannot right now." Juan also reported expenses of $1,050 per month for "Automobile payment, licensing, insurance," however, Juan admitted on cross-examination that he was not incurring this expense. Juan further admitted that his employer was covering "some" but "not all" of his expenses. Thus, even assuming Juan's remaining expenses were accurately reported, his actual monthly expenses at the time of trial would have been closer to $2,400, with at least a portion of those being paid by his employer.

With respect to income, Juan testified that he has a master's degree in finance and had previously described himself as an "international businessman." Sometime shortly after the parties' marriage, Juan started a "plastic recycling consulting" business called "Latam Consulting" (Latam). Crystal was a 50 percent owner of Latam, but she had no direct involvement with the business. Juan initially testified that Latam had been dissolved at the time of trial, but Crystal introduced evidence that the company continued to show an "active" status on the Nebraska Secretary of State's website as of February 10, 2022. In any case, Juan testified that he was no longer operating that business.

Sometime in 2016, Juan became a founding member and employee of a Canadian-based company called "Chakana Cooper Corporation" (Chakana). Juan served as "general manager" for a Peruvian subsidiary of Chakana. As will be discussed in more detail below, Juan was fired from Chakana in September 2019 for misappropriating company funds. Thereafter, in December 2019, Juan obtained employment as a "general manager" of a Peruvian mining company called "Eldorado Resources" (Eldorado). Juan was employed by Eldorado in that capacity at the time of trial, and Juan testified that he earned a gross monthly salary of $8,750. Juan also testified to involvement in a number of entities related to Eldorado, however, he testified that he did not derive any direct income from those related entities.

Juan testified vaguely to additional income from "consultancy services," and he previously attested in answer to an interrogatory that "[i]n addition, for the last few years, I have received money from my family of approximately $100,000-$125,000 per year." However, for purposes of calculating child support, Juan proposed that his total monthly income be set using only his net monthly salary of $8,050 from Eldorado. With respect to the nature of his consulting services, Juan testified as follows:

> Sometimes when people need help, like, I don't know, getting some money proficient, you know, when it's available, I help them because I know how the system works and stuff like that. Or related to mining or when they have environmental issue and want consultation, I help them because I do it through my connections.

Juan confirmed that he earned income from his consulting work, but he suggested that income be excluded for purposes of child support because:

> [I]t's money that I don't receive -- I receive, like, $1,000 every three months. You know, sometimes I don't even have the time to do it because it's really time consuming. . . . I can do it every three months, you know, when I have the time, or when I need the money[.]

With respect to the previously disclosed $100,000 to $125,000 per year from his family, Juan testified at trial that his prior statement was simply not true. Juan attempted to clarify the support he received from family as follows:

> Of course I received money from my parents, you know, in the last 10 years, 15 years. They paid for all my education. They paid for everything when I was living here in Omaha. . . . I never get $100,000 a year from my parents. . . . They give me probably money, yes, in the last few years. . . . They give me probably -- not 100,000 a year . . . I never receive 100 to 125,000. In the last few years, yes, of course.

Notwithstanding Juan's position that he could not afford his full temporary support obligation, Juan testified that he continued to spend between $3,000 and $6,000 on the children when he would visit Omaha about "every three months." Crystal similarly testified that Juan would show up in Omaha with "a fist full of cash" and spend "$3,000 plus" on the children each time he visited. Juan was asked whether that money was all "paid to [him] by Eldorado," and Juan responded as follows:

> No. Part of it, yes, because I save enough money to come back to Omaha. As I said before, sometimes, you know, I can do something on the side, but it's not on a regular basis. But I have to do something sometimes on the side just to basically come back to Omaha because I have to pay for my plane ticket, my hotel, in order to see my children.

In an attempt to clarify, Juan's counsel asked, "So are you getting paid large sums of money aside and apart from the wages you receive from Eldorado Resources?" Juan responded, "No, no, not really. It's just what [sic] I have time to do it." Crystal further testified that Juan normally wore expensive "designer clothes," and there was no dispute that Juan owned a "high-end" watch collection worth roughly $30,000.

For purposes of calculating child support, the district court set Juan's monthly income at $13,925. In light of all the evidence above, the court did not credit Juan's assertion that his income was limited to his salary from Eldorado. Rather, the court reasoned that Juan earned "[a]t a minimum" $13,925 per month. This figure represented Juan's reported net monthly salary of roughly $8,000, plus the $5,925 in purported expenses. In arriving at this figure, the court explicitly noted that the $13,925 "does not include the $100,000 to $125,000 . . . that [Juan] receives annually from his parents . . . [nor] the additional income [Juan] receives through his consulting regarding mining concessions and the use of his 'connections.'" The court also observed that Juan failed to account for the thousands of dollars that he admittedly spends on the children when he visits Omaha. The court imputed a full-time minimum wage salary to Crystal, which resulted in Juan owing Crystal a child support obligation of $3,116 per month for the parties' four children.

For purposes of alimony, the court noted the length of the marriage, 13 years, and the fact that Crystal was awarded sole physical and legal custody of the children, "requiring her to provide their exclusive care." The court also noted that Juan left the country in 2018,

> leaving [Crystal] and the minor children without support for a number of months . . . which culminated in [Crystal] and the children losing their home, having to sell their personal belongings, change schools and suffering a drastic difference in their lifestyle, left all four minor children in need of therapy.

While Crystal had recently begun to rebuild her cosmetology practice, the court observed that her present circumstances were still characterized by financial struggle, whereas, Juan had been allowed to freely pursue his career throughout the marriage. As will be discussed below, the evidence of Juan's financial interest in Eldorado and the related entities was inconclusive to say the least. Nevertheless, there was no dispute that Juan had the potential to earn significant sums if Eldorado is successful. Altogether, the court ordered that Juan pay alimony in the amount of $5,000 per month for 120 months.

*Division of Marital Estate.*

The primary disputes with respect to the division of the marital estate pertained to a proper allocation of marital debts and a proper valuation of Juan's admitted dissipation of marital assets. With respect to marital debt, Juan requested that roughly $158,000 of debt incurred on behalf of Latam be included in the marital estate and credited to him. Crystal alleged that Juan forged her signature on at least one of the Latam's credit accounts for which Juan sought credit. When asked about that allegation, Juan confirmed that Crystal "was 50 percent owner of the company, so . . . she needed to sign all the documents." When asked specifically whether he signed Crystal's name without her knowledge, Juan stated that he could not remember. Rather, Juan suggested it was irrelevant whether he forged Crystal's signature because he was volunteering to "take all the debt" anyway.

Juan also requested credit for $97,000 of debt, most of which Juan represented to be "joint" debts of the parties. However, when asked about this classification, Juan reversed course, testifying instead that each of the debts he listed as joint were actually in his name alone. Juan listed two additional debts solely in Crystal's name, one $16,000 Discover credit card debt and one $6,000 Von Maur credit card debt. Crystal denied responsibility for any charges on accounts either opened in Juan's name or on behalf of Latam. Crystal further testified that she had paid off the Von Maur account, and she denied responsibility for the $16,000 Discover credit card debt, despite acknowledging that the account had been opened in her name. There was very little evidence as to what any of these debts were incurred for; Juan testified only that the debts incurred by him were for both "business and household" expenses.

Juan confirmed multiple times that he had not made any payments on those accounts for over two years at the time of trial. Juan testified that he had been "trying to pay all that debt" and that "[h]opefully" he will be able to pay that debt "if [he] make[s] some money in the future." Juan further testified, "I intend to pay the payments because I don't want to file for bankruptcy." When asked again about the length of time during which no payments had been made, Juan retorted, "That debt is not in my name. It's not in Crystal's name. Where is it going? I don't understand."

Juan then suggested for the first time that he had not been making payments because he was "trying to consolidate the debt." In addition to a credit for these debts, Juan also sought a credit for $167,984 in temporary support arrears.

The district court declined to credit Juan for either the outstanding debt obligations or the temporary support arrears. With respect to the outstanding debt obligations, the court noted that Juan had not been making payments, adding that "it is unknown whether those creditors will ever pursue [Juan] outside the country to obtain judgments." The court further ordered Juan to "pay and hold [Crystal] harmless for the Discover card" opened in Crystal's name. With respect to the temporary support arrears, the court stated only that "[a]ll sums due and owing pursuant to the Temporary Order shall be preserved and not merged into this Decree." The court thus denied Juan's pending motion to modify the temporary support order, which was apparently filed on September 24, 2020, although we note that that motion itself does not appear in the appellate record.

Turning now to the parties' marital assets, there was much dispute over the extent of Juan's financial interest in Eldorado and the related entities. Juan explained that a friend of his started Eldorado in April 2019 for the purpose of reactivating a physical mine located in Peru that had previously gone bankrupt. That friend elicited Juan's involvement in December 2019, and the company entered into a "mining concession agreement" with the Peruvian government to lease "all the assets" of the mine in exchange for "close to 70-, 60-some million dollars" (USD) over the course of 25 years. Juan explained that a "mining concession" is simply "mining property" that is owned by and can be leased from the Peruvian government. The holders of a mining concession then have the right to "explore and exploit mineral resources within the covered area."

Juan testified that Eldorado is owned by another entity called "Mochica," which is a Canadian-based company organized for the purpose of raising money for Eldorado. As general manager of Eldorado, Juan also serves as "a director" of Mochica. Juan was also a founder and director of two additional related entities, Minera Zaira (Zaira) and "Calipuy." Juan testified that Zaira is a wholly owned subsidiary of Mochica which holds title to the mining concessions leased by Eldorado, and he explained that "Calipuy" is a "business shell" company based in Canada, which was "in the process of raising money to start looking for some [mining] projects in Peru."

Juan repeatedly denied any "ownership" or "business" interest in Eldorado, Mochica, Zaira, or Calipuy. Rather, Juan maintained that whatever financial interest he had in those entities was "an in earned interest," and he testified that the value of that interest was "[b]ased on the production [of the mine] and whether or not Eldorado is successful." In that regard, Juan emphasized that the success of the project was "[p]urely speculation" at that point, and thus he indicated that his "earned in interest" had not yet materialized and could not be divided.

However, prior to trial, Juan testified in a deposition that at that point his "percentage of ownership" in Eldorado was "[a]round 20 percent." Juan denied his prior testimony at trial, insisting instead that he was describing "an earned in interest." Juan testified, "[a]s I said before, everything is going to unfold from Eldorado to Mochica . . . as earned in interest." Immediately thereafter, Juan added "[m]ost likely I'm going to have options because I'm part of the management, yes." Elsewhere, Juan testified that "I already have some stock options and insurance with [Eldorado]." Moreover, the following exchange occurred between Juan and counsel for Crystal:

Q. You've raised $5.5 million [through Eldorado]; is that correct?
A. I didn't raise it. The company did.
Q. Okay. A company in which you own?
A. Yeah, but I'm not involved in raising money.

Despite this testimony, Juan maintained that he did not have any assignable ownership interest, suggesting the referenced "stock options" were irrelevant because "right now, it isn't worth anything . . . [i]t's purely speculation." In that regard, Juan explained that the actual mine was not yet operational and the company "doesn't generate any income . . . it raises money, and we invest in the company just to reactivate all the assets of the company." Juan then explained that, "as [Eldorado] begins to gain investments from investors . . . [e]verything is going to be diluted . . . [b]ecause at the end of the day, the management is going to have options and an earned in interest in the company after final dilution."

When asked specifically about Mochica, Juan testified that he "will have an interest" in that company at some point in the future. Similarly, with respect to Calipuy, Juan testified in a deposition that "[p]robably I will . . . [a]t some point I will" have an interest once Calipuy finds a project to invest in. Crystal's counsel sought to clarify this prior testimony, asking, "[s]o you have an ownership interest . . . [the company] just doesn't have a project yet, right?" Juan responded, "[t]he owner [sic] interest in [Calipuy], the capital is probably $1,000 . . . [n]othing." Juan explained that, similarly to Eldorado, he did have an ownership interest at some point, "[b]ut then I slowly started raising money and have to transfer all shares." Juan added, however, that "I'm going to stay probably as the director of the company and get an earned in interest in the company."

In light of this pervasive confusion regarding Juan's interests in the aforementioned entities, Crystal's position was simply that the court award her 50 percent of whatever assignable interest Juan did have in those entities, and that "if he says he doesn't own them, then [Crystal has] 50 percent of nothing." Noting that Juan's testimony on this matter was "somewhat confusing," the court adopted Crystal's proposed approach and ordered that "[Juan] shall assign to [Crystal] one half (50%) of his past, present and future interest in entities known as Eldorado Resources, Mochica, Zaira, and Calipuy, or their successors and or assigns."

Turning now to the valuation of Juan's dissipation of marital assets, there was no dispute that Juan was fired from Chakana in September 2019 for misappropriating approximately $500,000 USD of company funds for personal use. In October 2019, Juan reached a settlement agreement with Chakana, according to which Juan relinquished 4 million shares of Chakana stock "as compensation for misuse of funds." Additionally, "as a result of [Juan's] termination for cause," Chakana also canceled 1 million stock purchase options held by Juan. The sole dispute at trial pertained to the proper valuation of the relinquished shares and canceled options, which Crystal testified were "supposed to be, in essence . . . [the parties'] retirement."

Juan proposed that the dissipation of assets should be valued at $428,076 CAD, which was the actual amount of funds that Chakana reported to have been misappropriated. In support of this, Juan pointed to Chakana's consolidated financial statements from 2019 and 2020, which stated that "100%" of Juan's holdings were relinquished as "compensation" for the misuse of funds. Juan interprets this language to suggest that his relinquished assets were merely intended to make the company whole by returning the misappropriated assets. In other words, Juan suggests that

Chakana valued the entirety of his holdings in the company at exactly the amount of his misappropriation, such that the dissipation of assets should similarly be valued at that amount.

Crystal, on the other hand, testified that Chakana shares were trading at $0.49 per share as of "February or March of 2021." Thus, Crystal proposed that the entirety of Juan's former holdings be multiplied by $0.49, which resulted in a total dissipation of $1,960,000 for the 4 million relinquished shares and $490,000 for the 1 million canceled options. The court adopted Crystal's proposal to value the shares as of February or March 2021, and ordered that Juan be accountable for dissipating $2,450,000 in marital assets.

Juan's portion of the marital estate also included his watch collection valued at $30,000 and the roughly $16,000 Discover credit card debt for which Crystal disclaimed responsibility. Crystal's portion of the marital estate included the remaining proceeds from the sale of the parties' home, and each party was simply awarded "1/2" of the marital interest in Eldorado and the related entities. Altogether, the court ordered Juan to pay Crystal a total of $1,113,908 to equalize the marital estate and resolved a number of remaining issues that are not at issue in this appeal.

As mentioned above, the district court's decree was entered on March 21, 2022. On March 29, Juan filed a motion to alter or amend the decree, and on March 30, Crystal filed a motion for order nunc pro tunc, or in the alternative, a motion to alter or amend. On April 28, the court granted Crystal's motion for order nunc pro tunc to correct a clerical error in the decree. On May 12, the court granted Juan's motion to alter or amend in part to correct another error in the decree, but the court denied the remainder of Juan's requested relief. Juan then filed this appeal.

ASSIGNMENTS OF ERROR

Juan assigns that the district court erred in (1) improperly valuing the Chakana shares, (2) failing to credit Juan for marital debts, (3) dividing any future post-marital interest Juan may have in a corporation, (4) calculating child support by inflating Juan's income, (5) denying Juan's motion to modify the temporary support order, (6) failing to credit Juan for temporary support arrears, and (7) imposing an unreasonable alimony award to Crystal.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019).

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

ANALYSIS

The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Under Neb. Rev. Stat. § 42-365 (Cum. Supp. 2022), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the

party who brought that property to the marriage. *Rohde v. Rohde, supra*. The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Rohde v. Rohde, supra*.

Section 42-365 provides that the court may order payment of alimony and division of property

> as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

That section further provides that "[t]he purpose of a property division is to distribute the marital assets equitably" and "[t]he purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." § 42-365. In general, there is no dispute in this case regarding the classification of property as marital or nonmarital. Rather, Juan challenges the valuation of certain admitted marital assets and the court's ultimate division of the marital estate in accordance with the principles in § 42-365.

*Valuation of Chakana Shares.*

Juan raises two central arguments in relation to the district court's valuation of the Chakana shares that Juan dissipated as a result of his misappropriation of company funds. First, Juan challenges the date used by the district court to value the Chakana shares. Second, Juan challenges the sufficiency of the evidence in support of the share price adopted by the court. Notably, Juan does not challenge the district court's determination that the relinquished Chakana holdings constituted a dissipation of marital assets. Rather, Juan's arguments pertain only to the proper valuation of those holdings.

With regard to the date of valuation, Juan places particular emphasis on the district court's determination to divide the marital estate as of the date of trial. Juan argues that the Chakana shares were relinquished 2 years prior to trial, such that the date of trial was not rationally related to the dissipated asset. Rather, Juan suggests that the Chakana shares ought to have been valued "at the time of separation of the parties or, alternatively, on the date of Juan's termination from employment with Chakana." Brief for appellant at 25. While the court did adopt the date of trial as the "date the marital estate is valued for purposes of property division," such was not the date the court adopted for purposes of valuing the Chakana shares. Rather, the court clearly adopted Crystal's proposed share price of $0.49 as of "February or March of 2021."

In any case, Juan's argument illustrates that he believes the value of his dissipation of assets should be limited to the value of Juan's holdings at the time they were lost in 2019. However, the value of Juan's dissipation of assets is more accurately described as the loss incurred by the marital estate as a result of the dissipation. Thus, it was not an abuse of discretion for the district court to value Juan's dissipation of assets according to what those assets reasonably would have been worth

- 9 -

at some point after the dissipation itself. Which brings us to Juan's second argument that the district court's valuation of those assets was based on insufficient and unreliable evidence.

Juan argues that Crystal's testimony regarding the price of Chakana shares was "so vague and ambiguous as to provide the Court with no usefulness in determining the actual value" of those shares. Brief for appellant at 25. Instead, Juan argues the court should have derived a share price from Chakana's consolidated financial statements. As he did at trial, Juan first proposes that we value the relinquished holdings at precisely the same amount as Juan's reported misappropriation. Juan argues that because Chakana reported that Juan's holdings "were relinquished as compensation for misuse of funds," Chakana must have estimated "4 million shares of its stock was worth the same amount as Juan had misappropriated: $428,076.00 CAD," or roughly $0.11 CAD per share. Brief for appellant at 26.

In context, Chakana reported that the 4 million shares of stock were relinquished as "reimbursement for misappropriated funds *and related loss to the Corporation*" and "compensation for the misuse of funds." (Emphasis added.) Moreover, contrary to Juan's appeal that he relinquished his holdings simply to make the company whole, he testified at trial that the purpose of the settlement agreement was "to return the shares in order to avoid prosecution [from Chakana's officers]." Chakana further reported that "$1,233,509 [CAD]. . . was calculated as a reduction of average share capital cost at the time the [4 million] shares were cancelled." This suggests Chakana valued the 4 million shares of stock at $1,233,509 CAD, or roughly $0.31 CAD per share, as of "November 14, 2019." To the extent Chakana's 2019 and 2020 financial statements suggest a proper valuation of the dissipated assets in this case, they suggest a valuation much higher than Juan proposes.

Even if we agreed that Crystal's uncorroborated testimony was not the most reliable evidence of Chakana's share price at a given time, such was practically the only credible evidence available to the district court. Aside from Juan's interpretation of ambiguous language in Chakana's financial statements, he failed to counter Crystal's testimony with more reliable evidence of a proper valuation for his Chakana holdings. Thus, under the circumstances of this case, we reject Juan's proposed valuation, and we conclude it was not an abuse of discretion for the district court to value the 4 million relinquished Chakana shares at $0.49 per share as of February or March 2021.

With respect to the 1 million canceled options, Juan argues that the district court's valuation "clearly inflates the actual value of the purchase share options." However, Juan argues only that the court failed "to tak[e] into account the cost to Juan, or the marital estate, to initially purchase the stock under Chakana's purchase stock option plan." Brief for appellant at 27. Juan argues that "[w]hile Crystal testified to an amount she believed the shares were valued at, she did not testify as to the fixed price to purchase the shares to begin with. . . . The fixed price, also known as 'strike price' or 'exercise price', is $0.40 CAD per share." *Id*. at 28. Juan then argues as follows:

> If the District Court were to properly value the 4 million shares of Chakana at $428,076.00 CAD, then 1 million shares would be worth a quarter of this value, or $107,019.00 CAD. The cost of purchasing the shares would have been $400,000.00 CAD. Clearly this would have put the marital estate in a negative balance and should not have been taken into consideration for a dissipation of assets.

Alternatively, if the District Court would have included the exercise price of $0.40 per share to Crystal's testified value of $0.49 per share, the ultimate net value of the 1 million stock options would have been $90,000.00 (1,000,000 x $0.09) after they were purchased rather than the District Court's gross valuation of $490,000 because it would have cost $400,000.00 to purchase the stock.

It was an abuse of discretion for the District Court to fail to take into consideration the exercise price when determining the value of the dissipated purchase stock options. The above argument clearly establishes a great discrepancy in the value of the marital estate.

Brief for appellant at 28. We reject Juan's first argument for the same reasons we reject the companion argument above with respect to the 4 million relinquished shares. Beyond that, we reject Juan's argument as to the 1 million options because the record is simply inadequate to find an abuse of discretion in that regard.

Juan bore the burden to produce evidence to support his proposed valuation, yet he relies exclusively on exhibit 37, which was produced by Crystal and is simply unclear as to the terms of the options, the actual strike price, or, frankly, any other detail regarding the option arrangement. Having failed to provide reliable evidence to support his purposed valuation of the 1 million options, we cannot say it was an abuse of discretion for the district court to value Juan's dissipation of those assets at $490,000.

*Credit for Marital Debts.*

On appeal, Juan does not dispute the district court's handling of the Discover credit card account opened in Crystal's name. Rather, Juan only challenges the district court's refusal to credit him with the remaining outstanding debts he identified at trial. Juan argues that non-payment of debt is not grounds to exclude those debts from the marital estate, as "[i]t is evident that these debts benefited the marriage either by their use for household related items or related to Juan's business to acquire income for the marriage." Brief for appellant at 30. In contrast, Crystal argues that there was "little to no evidence supporting Juan's claims the debt he attributed as marital was for the joint benefit of the parties." Brief for appellee at 22. Rather, Crystal argues that "the evidence shows the debt was incurred without Crystal's knowledge or consent." *Id.* Thus, the apparent dispute between the parties on appeal is whether the debts were properly considered marital or nonmarital.

However, the district court did not indicate that a classification of the debts as marital or nonmarital was the dispositive factor for its disposal of those debts. Rather, the court first acknowledged that Juan set "forth a number of debts acquired during the course of the marriage," but then noted that Juan had not been paying on those debts and that it was "unknown" whether the creditors would pursue Juan outside the country to obtain judgments on those debts. It was on those grounds that the court declined to give Juan "credit for payment of those obligations." In this way, the court determined that Juan would not be entitled to credit for those debts whether or not they were properly classified as marital debts. Thus, the question on appeal is not whether those debts were properly classified as marital or nonmarital, but, rather, whether the court erred in refusing to credit Juan for payment of those debts.

There was no dispute that Juan had not been making payments on those debts for over two years at the time of trial, and, as the court noted, Juan lived outside of the country, which certainly may insulate him from legal action to collect on those debts. Moreover, especially in light of Juan's history, it is difficult to credit his self-serving testimony that he will "[h]opefully" pay those debts "if [he] make[s] some money in the future." If the court had credited Juan for payment of the outstanding debts, his portion of the marital estate would have decreased by roughly $250,000. Given the uncertainty regarding repayment of those debts, and the totality of the parties' circumstances, we conclude the district court's refusal to credit Juan for payment of marital debts was not an abuse of discretion.

*Allocation of Business Interests.*

Juan argues the district court erred in ordering him to assign Crystal 50 percent of his past, present, and future interests in Eldorado, Mochica, Zaira, and Calipuy. Juan does not dispute the 50/50 division of whatever interests he may have held during the marriage, confirming that "if Juan did have an ownership interest in these companies during the marriage they would be subject to division accordingly." Brief for appellant at 32. Rather, Juan argues it was an abuse of discretion to allocate "post-decree future interests that Juan may acquire in the future from these companies." *Id*. However, we disagree that the court purported to divide future interests that Juan "may acquire in the future." Rather, we conclude the district court simply ordered Juan to assign 50 percent of his "future interests" to the extent they existed at the time of trial. This was not an abuse of discretion.

*Child Support.*

Juan argues the district court inflated his monthly income for purposes of calculating child support. Specifically, Juan argues the court erred in finding that he earned additional income beyond his salary from Eldorado, and that the court erroneously found that Eldorado was paying the totality of his purported monthly expenses. From our review of the record, we cannot say the district court abused its discretion in setting Juan's monthly income at $13,925 per month for purposes of calculating child support.

Juan is correct that his testimony was that Eldorado was paying "some" as opposed to all of his expenses at the time of trial. Yet, Juan also testified that his two largest purported expenses simply did not exist at that time. Moreover, it was exceedingly difficult to ascertain the extent of Juan's additional income from consultancy services and his parents. Thus, under the circumstances of this case, it was not an abuse of discretion for the court to set Juan's monthly income at $13,925.

*Temporary Support Order.*

Juan next assigns that the district court erred in denying his motion to modify the temporary support order. However, Juan's position on appeal, as it was at trial, is that he "simply did not have the income to pay [the full] amount during the pendency of the case." Brief for appellant at 38. Like the district court, we do not credit Juan's claim that his monthly income was limited to his net $8,050 salary from Eldorado. Under the circumstances of this case, it was not an abuse of discretion to deny Juan's motion to modify the temporary support order.

*Temporary Support Arrears.*

Juan argues that

> The equities of the situation indicate an equitable credit [for temporary support arrears] would be beneficial to the parties to ease the division of the marital estate and limit the amount Crystal would be required to pay in order to equalize the marital estate if the estate is divided in the manner consistent with arguments made by Juan.

Brief for appellant at 40. Having already declined to divide the marital estate in a manner consistent with Juan's arguments on appeal, there is no merit to Juan's suggestion that allowing him a credit for temporary support arrearage would be beneficial to the parties or ease division of the marital estate.

*Alimony.*

Finally, Juan argues the district court's alimony award of $5,000 for 120 months was unreasonable. Juan does not contest that "some form of alimony is justified." Brief for appellant at 41. Rather, Juan's position is that "$5,000.00 per month is excessive and unreasonable when accounting for Juan's income, child support obligation, and ongoing monthly living expenses." *Id.* Juan proposes that we reduce the alimony award to $2,500 per month. Under the circumstances of this case, the district court's alimony award was not an abuse of discretion, and we decline Juan's request to modify that award.

## CONCLUSION

For the foregoing reasons, we affirm.

AFFIRMED.